Paul David BROWN, III, Appellant
(Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 96–47.

Supreme Court of Wyoming.

Feb. 12, 1998.

1172

Sylvia Lee Hackl, State Public Defender; Deborah Cornia, Appellate Counsel; and Diane Lozano, Assistant Public Defender, for Appellant (Defendant). Argument by Ms. Lozano.

William U. Hill, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Jon R. Forwood, Special Assistant Attorney General; and Mary Beth Wolff, Special Assistant Attorney General, for Appellee (Plaintiff). Argument by Ms. Wolff.

Before TAYLOR, C.J., and THOMAS, MACY, GOLDEN and LEHMAN, JJ.

LEHMAN, Justice.

Appellant, Paul David Brown III (Brown), appeals the judgment and sentence of the district court convicting him of conspiracy to commit first degree murder. We affirm.

Brown sets forth five issues for our review:

*ISSUE I*

Did the trial court abuse its discretion by admitting evidence in appellant's second trial that it disallowed in the first trial and altering a jury instruction from the first trial to the second?

*ISSUE II*

Did the trial court err when it permitted the state to use prior bad acts against the appellant in order to obtain a conviction?

*ISSUE III*

Did the trial court commit reversible error when it admitted the hearsay statements of a co-conspirator?

*ISSUE IV*

Was the admission of testimony of the State's witness stating that appellant was guilty of the crime charged error per se and deny appellant his right to a trial by jury [sic]?

*ISSUE V*

Did the trial court err when it refused to give the defense theory of the case instruction?

The State articulates a single issue:

Whether the trial court properly admitted all evidence and properly instructed the jury.

**FACTS**

Paul Brown arrived in Cheyenne, Wyoming on September 12, 1994, after separating from his wife in Estes Park, Colorado. Upon his arrival, he stayed at the Comea Shelter for one week. He then got a job as a dishwasher at the Luxury Diner and moved into his own room at the Wyoming Motel. At that time, he began frequenting the neighboring Lincolnway Detail Center and became friends with the owner, Joseph Vena, and his employees.

In October 1994, Randy Smith, an agent from the Bureau of Alcohol, Tobacco and Firearms (ATF), brought his vehicle into Vena's detail shop and asked Vena to phone him when the vehicle was ready. Vena discovered that the phone number belonged to ATF, and informed Smith that his friend, Paul Brown, may have some information concerning criminal activity involving guns and narcotics in the Cheyenne area. Special Agent Kenneth Bray of the ATF contacted Brown and hired him as an undercover informant. Shortly thereafter, Vena, who had worked extensively as a paid witness and informant in the past, also signed an agreement to become an informant. Between November 18 and November 21, 1994, Brown and Vena set up two controlled buys of narcotics for the ATF at the Lincolnway Detail Center. A third buy had been scheduled to take place on November 30, but was thwart-

ed because police officers were on site investigating the disappearance of James Guthrie.

On November 30, 1994, a male body was discovered adjacent to a county road in a remote area of Weld County, Colorado. Investigators called to the scene observed that the man had died as a result of two shotgun blasts to the chest and neck. One of the wounds contained small fragments, including cut-up pieces of screws, razor blades, dimes and glass, demonstrating a homemade shotgun shell. The same day, Wyoming highway department employees discovered bags of personal items and bloody clothes in two different trash barrels along Interstate 80 between Cheyenne and Laramie. Among the items found were identification cards for James Calvin Guthrie and a pay stub from the Lincolnway Detail Center in Cheyenne. The Wyoming Highway Patrol sent a teletype to authorities in Wyoming and Northern Colorado inquiring if a body had been discovered, and within an hour they received a response from Weld County.

Investigators learned that Guthrie had been an employee of Vena, ·and his last known residence was a back storage room at the Detail Center. Witnesses last saw Guthrie at 5:00 p.m. on November 28, 1994, when he returned to the Detail Center after a dentist appointment. On November 29, at Vena's direction, employees at the Detail Center had cleaned the storage room, washing the walls and throwing Guthrie's bed into a dumpster. Officers discovered evidence of blood spatter in Guthrie's room and that his bedding had been the sleeping bag in which his body was found. This information led investigators to believe that Guthrie had been killed inside the Detail Center.

Investigators had also discovered that Brown owned a shotgun and that both he and Vena were seen together in a car driven by Vena early on the morning of November 29, 1994. The car was examined on December 2, and traces of blood were found in the trunk and passenger compartment. That same day, Agent Bray went to the Detail Center and asked Brown and Vena to come in for questioning by Cheyenne police detectives about Guthrie's disappearance. Neither were advised that Guthrie's body had been found. Following his interview at the police station, Brown was arrested for the murder of Guthrie. The next evening at the police station, Vena implicated himself and Brown in Guthrie's murder, outlining his knowledge of the circumstances surrounding the shooting and directing officers to various locations along Interstate 80 where he and Brown had disposed of evidence. Vena was arrested on December 4.

Brown was charged with one count of conspiracy to commit murder and one count of murder in the first degree. At the close of a four-day trial in September 1995, Brown was acquitted on the first degree murder charge, but the jury was unable to reach a verdict on the conspiracy charge. Brown's second trial, for conspiracy to commit murder, was held in early December 1995. After the five-day trial, Brown was found guilty and sentenced to a mandatory life term in the Wyoming State Penitentiary. He timely appeals.

## DISCUSSION

### Changed evidentiary rulings between first and second trial

■ Brown argues that the trial judge improperly admitted evidence in his second trial that was excluded in his first trial. Brown's contention is that the rulings of the trial court in the first trial stood as the law of the case, and that the court erred in Brown's retrial when it made different rulings based on the same evidence.

■ Under the law of the case doctrine, a decision on an issue made by a court at one stage of a case should be given effect in successive stages of the same litigation. 1B, MOORE'S FEDERAL PRACTICE ¶ 0.404[1] (2d ed.1991). The doctrine is designed to avoid repetitious litigation and to promote consistent decision making. *Triton Coal Co. v. Husman, Inc.*, 846 P.2d 664, 667 (Wyo.1993). The, law of the case is a discretionary rule which does not constitute a limitation on the court's power but merely "expresses the practice of courts generally to refuse to reopen what has been decided." WRIGHT, MILLER & ·COOPER, FEDERAL PRACTICE AND PROCEDURE: § 4478, at 790 (1981) (quoting *Messinger v. Anderson*, 225 U.S. 436, 444, 32

S.Ct. 739, 740, 56 L.Ed. 1152 (1912)).[1] The doctrine of the law of the case, therefore, does not foreclose a trial court from reconsidering issues in a case previously decided by the same court. WRIGHT, ET AL., at 789.

Brown urges us to follow those jurisdictions which have limited a court's discretion to revisit issues previously decided. *United States v. Tham*, 960 F.2d 1391 (9th Cir.1991) (precluding reversal of identical evidentiary ruling made during first trial absent clear error or a change in circumstances); *United States v. Duchi*, 944 F.2d 391, 392–93 (8th Cir.1991) (precluding reconsideration of previously decided issues unless substantially different evidence is subsequently discovered or prior decision will work a manifest injustice on one of the parties). We do not believe such limitations are warranted. Generally, a trial judge has broad discretion on evidentiary rulings because this type of decision turns upon the evidence as developed during the course of a trial. *United States v. Akers*, 702 F.2d 1145, 1148 (D.C.Cir.1983). Rigorously applying the law of the case doctrine would undercut the broad discretion traditionally accorded trial courts in these matters. We hold that a district court is not bound by prior evidentiary rulings made during the course of a prior proceeding but may, in its discretion, reconsider such rulings. *United States v. Todd*, 920 F.2d 399, 402 (6th Cir.1990). Consequently, a court may recognize and enforce prior rulings based on the law of the case doctrine, but the court also retains the power to reconsider previously decided issues as they arise in the context of a new trial. *Id.*;

*Pearson v. District Court*, 924 P.2d 512, 515 (Colo.1996).

Having determined that the trial court could revisit evidentiary rulings made at the first trial, our focus shifts to whether the court properly admitted the challenged evidence. In general, rulings on the admissibility of evidence are within the sound discretion of the trial court and are entitled to considerable deference. *Vit v. State*, 909 P.2d 953, 956–57 (Wyo.1996). Such rulings will not be disturbed on appeal absent demonstration of a clear abuse of discretion. *Hayes v. State*, 935 P.2d 700, 702 (Wyo.1997). This court will not find an abuse of discretion as long as a legitimate basis exists for the trial court's rulings. Thus, unless the court acted in a manner exceeding the bounds of reason, no abuse of discretion will be found. *Vit*, 909 P.2d at 956–57. Likewise, a trial court's decisions regarding admissibility of uncharged misconduct evidence are entitled to great deference on appeal. *Ross v. State*, 930 P.2d 965, 968 (Wyo.1996). Where the defendant has not submitted a pretrial motion to suppress or objected at trial, the admission of evidence must amount to plain error in order to warrant reversal. *Id.* This court will find plain error only when the appellant demonstrates a violation of a clear and unequivocal rule of law, denial of a substantial right, and that the appellant has been materially prejudiced. *Id.*

Rule 404 of the Wyoming Rules of Evidence prohibits character evidence for the purpose of showing that the defendant acted in conformity with his "bad character," but permits the use of such evidence for other purposes.[2] The key inquiry is whether the

---

1. The flexibility of this doctrine varies, of course, with the context of its application. "When matters are decided by an appellate court, its rulings, unless reversed by it or a superior court, bind the lower court." *Insurance Group Comm. v. Denver & R.G.W.R. Co.*, 329 U.S. 607, 612, 67 S.Ct. 583, 585, 91 L.Ed. 547 (1947). On the other hand, the cases reflect varying degrees of deference to rulings by different judges or courts. 18 WRIGHT ET AL., *supra*, § 4478, at 794–98.

2. Rule 404 of the Wyoming Rules of Evidence provides in relevant part:

(a) *Character evidence generally.*—Evidence of a person's character or a trait of his character is not admissible for the purpose of proving

that he acted in conformity therewith on a particular occasion, except:

(1) Character of Accused.—Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same;

. . . .

(b) *Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

act tends to prove something other than propensity to commit the charged crime and, if so, whether relevancy outweighs the risk of prejudice. 1 CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FEDERAL EVIDENCE, § 106, at 584 (2d ed.1994); W.R.E. 402, 403; *Vigil v. State,* 926 P.2d 351, 357 (Wyo.1996).

Brown objects to the following testimony as inadmissible character evidence:

- **Rex Barker,** Brown's cellmate at Laramie County Jail, testified that Brown said Vena would "take care of" Brown's wife if Brown helped Vena with the Guthrie problem.

- **Paul Palmer,** Brown's roommate for a couple of weeks, testified that he helped Brown make homemade shotgun shells by cutting up metal pieces (clothes hangers, pennies, nickels, dimes) and that Brown told him, "the way he was doing it was for killing. He could take and use one of the shells and go down and shoot somebody with it and say, here, keep your change." Palmer also testified that Brown told him he was tied in with the Mafia.

- **Amos Curtis Watts,** resident manager at the Comea Shelter when Brown stayed there, testified that Brown dressed like a Mafia person.

- **Caroline Hargraves,** employee at Cupid's Adult Bookstore, testified that Brown and Vena came into the store dressed in long trench coats and "stupid" hats, that Vena asked for her boss' roommate and said when he found him he would kill him, and that Vena did all the talking while Brown stood there with one hand inside his coat, the other holding the coat closed, all the while staring straight ahead at her.

- **Valerie Stein,** bartender at the Eagle's Nest Tavern, testified that Brown told her he had Mafia connections, that he would take care of someone who was causing one of her friends a problem, that she assumed Brown meant he would kill the person, and that he would take care of the problem for free.

Brown contends that this evidence prejudiced Brown in the eyes of the jury by branding him as a tough guy with Mafia connections. Brown represents that he sought to exclude this testimony through motions in limine as well as trial objections. We have carefully reviewed the record and find that representation not entirely correct. The record contains no pretrial motion or trial objection to Rex Barker's testimony. Brown submitted a motion in limine to preclude Curtis Watts from testifying that Brown told Watts he knew how to make homemade shells, but the record contains no objection before or during trial to exclude Palmer's testimony about the shells. Barker's testimony was relevant to show Brown's motive to enter the conspiracy to kill Guthrie—if he did, Vena would help Brown "take care of" his wife. Palmer's testimony that he helped Brown make homemade shotgun shells was relevant because Guthrie was shot with at least one homemade shell, the incident occurred within a couple weeks of the crime, and it was circumstantial evidence of planning and preparation for the crime. Brown has failed to demonstrate that Barker's testimony and Palmer's "homemade shells" testimony violated a clear and unequivocal rule of law; and, therefore, we find no plain error.

Brown did submit a motion in limine seeking to exclude any references to Brown claiming to be a gangster or related to John Gotti, which covered statements made at trial by Watts, Palmer and Stein. During a pretrial motions hearing, the court determined that testimony from witnesses who had conversations with Brown in which he represented himself to be Mafia-connected was not character evidence. For purposes of W.R.E. 404, character evidence means proof relating to commonly-recognized human qualities that might be called innate or essential to the person being described. 1 MUELLER & KIRKPATRICK, *supra,* § 101, at 551. Behavior or acts are often behind descriptions of character, but describing acts is not the same thing as giving character evidence, and an account of acts does not necessarily fit Rule 404. *Id.* While a person's representation of himself as a member of the Mafia presents the same dangers of unfair prejudice as generalized assertions of bad moral character, Rule 404(b) is not clear

whether such evidence is to be treated as evidence of character. WRIGHT & GRAHAM, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 5233, at 357 (1978). In such circumstance, close attention to relevance may help to resolve any potential problems. *Id.*

■ The court found the Mafia testimony relevant to counter Brown's portrayal of himself as a troubled young man who came to Cheyenne to clean up his life and fell in with the wrong crowd—in other words, to show he was a "bad guy." We recognize that evidence of a person's associations falls into a gray area, however when the only relevance of the testimony is to show a defendant's bad character, Rule 404 applies. While the State is permitted to rebut character evidence when the defendant has put character in issue, the State is not permitted to present evidence of a person's character in the State's case-in-chief. W.R.E. 404(a)(1). The court abused its discretion when it admitted the Mafia testimony prior to Brown's insertion of that issue into the case.

■ The improper admission of 404(b) evidence does not mandate reversal of a conviction in all instances. *Bishop v. State,* 687 P.2d 242, 246 (Wyo.1984). "A nonconstitutional error, as in the case of erroneous admission of similar act evidence, is harmless if it is 'highly probable' that the error did not contribute to the verdict. Where there is overwhelming evidence of guilt, ... erroneous evidentiary rulings on such collateral matters are often harmless." *Id.* (quoting *United States v. Corey,* 566 F.2d 429, 432 (2d Cir.1977) (citation omitted)). For an error to be regarded as harmful, there must be a reasonable possibility that, in the absence of the error, the verdict might have been more favorable to the defendant. *Id.* at 247. First, we note the limited nature of the improper testimony. Both Palmer's and Watts' Mafia testimony consisted of one isolated remark during direct examination, and the jury was told to disregard Watts' statement. Further, the jury was given a limiting instruction prior to Stein's testimony. We presume the jury follows the court's instructions. *Ramirez v. State,* 739 P.2d 1214, 1220

(Wyo.1987). The State presented a substantial amount of evidence which established Brown's guilt, including Vena's statements, testimony from Laura Feliz Cantu about Brown's and Vena's activities on the night of the murder, and Palmer's admissible testimony about helping Brown make homemade shells. Because of the other evidence introduced against Brown, we hold that there is not a reasonable possibility that the verdict would have been different, and introduction of the Mafia testimony was harmless beyond a reasonable doubt.

In a pretrial motions hearing, the court conducted the five-part *Dean* [3] analysis to determine the relevancy of Hargraves' and Stein's testimony and then undertook a balancing test to insure the probative value outweighed the danger of unfair prejudice. *Dean v. State,* 865 P.2d 601, 606 (Wyo.1993); W.R.E. 403. The court again conducted 404(b) hearings outside the jury's presence prior to the witnesses' testimony. The court concluded that Hargraves' testimony was relevant to show a course of conduct between Brown and Vena. Stein's testimony, though relating a conversation the night after the murder, was deemed relevant to show Brown's motivation for participating in the conspiracy, as well as his state of mind during the conspiracy. Before Hargraves and Stein testified, the court informed the jury that the evidence was not offered to prove Brown's character, his propensity to commit crimes, or that he committed the conspiracy crime for which he was on trial, but only could be considered for the limited purposes described above.

Hargraves' testimony has utility in that it provides context for the relationship between Brown and Vena that would otherwise be difficult to understand. *See Vigil,* 926 P.2d at 358. The episode at Cupid's Adult Bookstore shows cooperative action by Vena and Brown which supports inferences about the roles that each played in the conspiracy to murder Guthrie. The court did not abuse its discretion when it admitted Hargraves' testimony.

---

**3.** The five-part *Dean* test was modified in *Vigil v.* *State,* 926 P.2d at 357, after the trial in this case.

The court found that Brown's conversation with Stein, in which he offered to "take care of" a person causing one of Stein's friends a problem, occurred close enough in time to the crime—within 24 hours—to be probative of Brown's state of mind when the crime was committed. The State contends one of Brown's motivations for entering into the conspiracy was to convince Vena he was a tough guy so Vena would help him get rid of his wife. In order to do so, Brown adopted a tough guy persona around others, as evidenced by the conversation with Stein. The court carefully considered Stein's testimony before and during trial, undertook a detailed *Dean* analysis and balancing test, and gave a proper limiting instruction. The trial court is in the best position to determine relevancy or irrelevancy of particular evidence based on the facts and evidence as they have developed at trial. Although Stein's testimony appears dangerously close to being propensity evidence, we are unwilling to second-guess the court's ruling under these circumstances; consequently, we find no abuse of discretion.

### Statements of co-conspirator

Pursuant to Rule 804(b)(3) of the Wyoming Rules of Evidence, the court permitted ATF Agent Bray and Cheyenne Police Detective Zukauckas to testify as to statements Vena made during the investigation of Guthrie's murder which implicated Brown. In addition, during Zukauckas' testimony a portion of Vena's taped confession was played. Brown asserts that the statements were not admissible under W.R.E. 804(b)(3) or 801(d)(2)(e) and that the admission of this evidence violated his constitutional right to confront the witnesses against him.

"Hearsay evidence is ordinarily inadmissible; however, it can be received in evidence if it falls within one of the exceptions to the hearsay rule found in the Wyoming Rules of Evidence and it bears sufficient indicia of reliability to avoid violation of the Confrontation Clause." *Johnson v. State*, 930 P.2d 358, 361–62 (Wyo.1996). We will not reverse a decision admitting hearsay unless there is clearly no adequate basis in law supporting the trial court's rulings. *Id.* at 362.

Rule 804(b)(3) provides an exception to the hearsay rule for statements against the declarant's penal interest.[4] The exception applies only if the declarant is unavailable as a witness. The rule reaches statements that are themselves self-inculpatory, not collateral statements. *Johnson*, 930 P.2d at 363; *Williamson v. United States*, 512 U.S. 594, 600–01, 114 S.Ct. 2431, 2435, 129 L.Ed.2d 476 (1994). A statement admitting that the declarant engaged in certain conduct which is intertwined or closely connected to statements that another was also involved can satisfy the against-interest requirement, even if spreading the blame serves the interests of the declarant. 4 CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FEDERAL EVIDENCE §§ 496, 501 (2d ed. 1994 & Supp.1996). However, statements implicating others should be viewed with caution as they may be highly self-serving. *Id.; Williamson*, 512 U.S. at 601–02, 114 S.Ct. at 2436. "[W]hether the statement was sufficiently against the declarant's penal interest 'that a reasonable person in the declarant's position would not have made the statement unless believing it to be true,' . . . can only be answered in light of all the surrounding circumstances." *Johnson*, 930 P.2d at 363 (quoting *Williamson*, 512 U.S. at 603–04, 114 S.Ct. at 2437).

Vena's unavailability as a witness is not challenged, so we turn to the circumstances surrounding Vena's statements to police. Agent Bray and Detective Zukauckas conducted an interview with Vena at the police station on December 3, from approximately 11:00 p.m. to 1:30 a.m. After the interview, in the early morning hours of December 4, Vena accompanied the officers to various lo-

---

4. Wyoming Rule of Evidence 804(b)(3) provides:
 (b) *Hearsay exceptions.*—The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: . . . (3) Statement against interest.—A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true.

cations along I–80 where Vena said he and Brown disposed of evidence. Because it was too dark to see, Vena agreed to meet with the officers later that day. The officers picked Vena up around noon at his girlfriend's house and spent about an hour at the police station. Vena was apprised of his *Miranda* rights and signed a waiver of those rights. Vena and Bray (along with several search teams) left the station around 1:30 p.m. and searched the interstate until nightfall, approximately 5:00 p.m. Zukauckas and Bray interviewed Brown again when they returned to the police station; and, after that interview, Vena was arrested.

Prior to the first trial, defense counsel submitted a motion in limine seeking to prohibit the State from introducing statements made by Vena during the interviews with the officers. The trial court heard argument; considered the motion in two pretrial hearings; and ruled that, pursuant to *Williamson*, the self-inculpatory portions of Vena's statements describing conversations between him and Brown about preparation and planning of the murder were admissible under Rule 804(b)(3). The court ruled that statements by Vena which pointed the finger at Brown as the triggerman were not admissible. In the motions hearing before the second trial, the court adhered to that general ruling, but permitted Vena's self-inculpatory statements describing the events after the murder in addition to the pre-murder events. The testimony at trial conformed to the court's ruling. The record on appeal does not include the tape recording played during the trial nor a transcript of the tape; we therefore assume that it, too, conformed to the court's order. *See Edwards v. Edwards*, 732 P.2d 1068, 1070 (Wyo.1987) (in absence of record, reviewing court must assume trial court heard evidence from which it could find as it did).

■■■ The court determined Vena's statements to be trustworthy to the extent that they incriminated Vena and Brown equally. In addition, we observe that Vena had not yet been arrested when he made the statements, and he voluntarily continued to provide information after he had been given *Miranda* warnings. Nothing in the record

suggests he was attempting to negotiate a plea (so that his statements could not be used against him at trial) or that he was promised leniency for his cooperation. *See United States v. Garcia*, 897 F.2d 1413, 1420–21 (7th Cir.1990) (post-arrest statements implicating declarant and defendant made during custodial interrogation when declarant may have sought to curry favor fit exception because declarant voluntarily spoke after warnings and did not enter into plea agreement). In view of the circumstances surrounding Vena's statements, the trial court did not abuse its discretion in finding Vena's statements trustworthy and admitting those statements under Rule 804(b)(3).

■■■ Where a statement against penal interest inculpates the accused, its admissibility must be measured against standards fixed by the Confrontation Clause of the Sixth Amendment and its counterpart, Section 10, Article I of the Wyoming Constitution, as well as by the rule of evidence. *Hopkinson v. State*, 632 P.2d 79, 132 (Wyo. 1981), *cert. denied* 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982). An underlying purpose of the Confrontation Clause is to augment accuracy in the fact finding process by insuring a defendant an effective means to test adverse evidence. *Ohio v. Roberts*, 448 U.S. 56, 65, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980). Face-to-face confrontation of a witness at trial is preferable, and a primary right secured by the provision is the right of cross-examination. *Id.*, at 63, 100 S.Ct. at 2539. However, out-of-court statements which bear adequate "indicia of reliability" so there is no material departure from the substance of the constitutional protection may be introduced against a defendant. *Id.*, at 65–66, 100 S.Ct. at 2539.

■■■ In this case, the required guarantees of trustworthiness are present. First, Vena's statements were made voluntarily, before he was arrested, and were highly incriminating. *Williamson*, 512 U.S. at 605, 114 S.Ct. at 2437 (the very fact that a statement is self-inculpatory is itself one of the particularized guarantees of trustworthiness that makes a statement admissible under the Confronta-

tion Clause).[5] Second, the colloquies between Vena and the investigating officers reflect the fact that Vena was not offered any leniency in exchange for his statements. In fact, Vena was convicted of both murder and conspiracy and is serving consecutive life sentences for those crimes. *Vena v. State*, 941 P.2d 33, 36 (Wyo.1997). Finally, Vena provided a level of detail about the crime and the location of evidence that would be difficult to fabricate, that indicated intimate knowledge of the crime, and that was substantially corroborated when officers located shotgun parts and spent shells along the interstate. *See Johnson v. State*, 930 P.2d at 368 (citing *Idaho v. Wright*, 497 U.S. 805, 822, 110 S.Ct. 3139, 3150, 111 L.Ed.2d 638 (1990) (presence of corroborating evidence can be one factor in determining whether a particular hearsay statement possesses sufficient indicia of reliability, or it may more appropriately indicate that any error in admitting the statement was harmless)). We conclude that Vena's statements bore adequate indicia of reliability and, therefore, the admission of those statements did not violate the Confrontation Clause.

### Jury instructions

Brown sets forth two arguments with regard to the jury instructions. First, he argues that the trial court impermissibly allowed a change in a jury instruction in the second trial. This argument is premised, like his evidentiary challenges, on the law of the case doctrine. Second, Brown contests the failure of the trial court to submit to the jury his instruction on the crime of accessory after the fact to first degree murder.

Brown contends that the trial court erred by adding language to an instruction defining conspiracy. In the first trial, the following instruction was given:

> Two or more persons "conspire" when they agree to commit a felony under the statutes of Wyoming. It is a kind of "partnership in criminal purposes," in which

each member becomes the agent of every other member. The gist of the offense is a mutual understanding or agreement to commit a felony.

> While conspiring involves an agreement to violate the law, it is not necessary that the persons charged met together and entered into an express or formal agreement, or that they stated in words or writing what the scheme was or how it was to be effected. It is sufficient to show that they came to a mutual understanding to accomplish a felony.

Instruction No. 8, first trial. In the second trial, the following language was added to the last sentence: "and this may be shown by inferences reasonably drawn from the course of conduct of the alleged conspirators." Instruction No. 5, second trial. Brown does not contend that the instruction given in the second trial contained an error of law. His argument centers on the notion that the law of the case doctrine is violated when a court changes an instruction that had been given in an earlier trial.

 We have applied the law of the case doctrine to preclude appellate review of jury instructions which were not objected to before the jury began deliberations unless a plain or fundamental error can be shown. *Sanchez v. State*, 751 P.2d 1300, 1308 (Wyo. 1988) (citing *Cutbirth v. State*, 663 P.2d 888, 891 (Wyo.1983)); *see also Saldana v. State*, 685 P.2d 20, 23 (Wyo.1984), *cert. denied* 471 U.S. 1103, 105 S.Ct. 2331, 85 L.Ed.2d 848 (1985). Brown cites no authority to support his contention that law of the case operates to preclude the parties from offering new jury instructions in a second trial. Here, the phrase which was added to the conspiracy instruction correctly states Wyoming law— that an agreement between two persons in a conspiracy may be shown by inferences reasonably drawn from the course of conduct of the alleged conspirators. *Smith v. State*, 902 P.2d 1271, 1281–82 (Wyo.1995); *Wehr v.*

---

**5.** The United States Supreme Court has stated that where hearsay has sufficient guarantees of reliability to bring it within a firmly rooted exception to the hearsay rule, the Confrontation Clause is satisfied. *White v. Illinois*, 502 U.S. 346, 356, 112 S.Ct. 736, 743, 116 L.Ed.2d 848 (1992). However, the Court has not yet decided whether the hearsay exception for declarations against interest is "firmly rooted" for Confrontation Clause purposes, *Williamson v. United States*, 512 U.S. at 605, 114 S.Ct. at 2437, and we do not address that issue today.

*State,* 841 P.2d 104, 110–11 (Wyo.1992). The trial court did not err in submitting Instruction No. 5 to the jury.

 Brown also contends that he was denied his right to present his theory of the case to the jury when the trial court refused to give his proposed instruction on the crime of accessory after the fact to first degree murder. Brown's theory is that the State presented evidence that Brown was an accessory during its case-in-chief in an effort to demonstrate course of conduct; and if the jury believed part, but not all, of the State's evidence, the jury could conclude that Brown assisted only in disposing of the evidence used by Vena in the commission of the crime.

 Brown correctly asserts that due process considerations entitle criminal defendants to a theory of the case instruction when the instruction properly recites Wyoming law and competent evidence has been presented to support the defendant's theory. *Harris v. State,* 933 P.2d 1114, 1126 (Wyo. 1997). In addition, the offered instruction must present a defense recognized by statute or case law in this jurisdiction. *Bouwkamp v. State,* 833 P.2d 486, 490 (Wyo.1992).

 The instruction Brown contends was improperly refused did not present such a defense. "Suggestion of an alternative charge is not a defense to the crime being prosecuted. It may offer the jury a different way to interpret the facts, but does not present a defense against the murder charge." *Id.* Brown's general theory of defense was that he did not commit the crime charged. He claimed that Vena was solely responsible for the murder and its coverup and that there was no evidence that Brown or any other person assisted Vena in the commission of the crime. After the evidence and Brown's "no involvement" theory had been fully presented to the jury, Brown attempted to advance the theory—solely by instruction—that all he did was help dispose of the body. In other words, he defended by claiming to be innocent of the crime charged, but as the trial neared an end, he was willing to admit that he helped cover up the murder. His offered instruction was essentially an attempt to amend the charges. *Id.* at 490–

91. However, charging decisions lie with the prosecutor, and the defendant cannot alter or amend the charges. *Id.*

Nor is accessory after the fact a lesser included offense of conspiracy. Under the statutory elements test, "one offense is not 'necessarily included' in another unless the elements of the lesser offense are a subset of the elements of the charged offense," and if "the lesser offense requires an element not required for the greater offense, no instruction is to be given under [W.R.Cr.P. 31(c) ]." *State v. Keffer,* 860 P.2d 1118, 1134 (Wyo. 1993) (citations omitted). The elements of the crime of accessory after the fact to first degree murder are not a subset of the elements of conspiracy to commit first degree murder. *Compare* W.S. 6–5–202 *with* W.S. 6–2–101, 6–1–303. The accessorial crime requires that the accessory act with the intent to hinder or delay his principal's discovery or punishment for a crime and that a murder be committed. W.S. 6–5–202. Neither of those two elements is required to complete the crime of conspiracy to commit murder. W.S. 6–2–101, 6–1–303.

The trial court had no obligation to instruct the jury on a crime that was neither charged nor a lesser included offense of the crime charged—a crime on which the jury could not convict. *Bouwkamp,* 833 P.2d at 491. The court properly refused Brown's accessory instruction.

### Witness' opinion as to Brown's guilt

At trial, one of the State's witnesses, Laura Feliz Cantu, was asked at the conclusion of direct examination if she had anything against Paul Brown and Joseph Vena, to which she replied, "Just the fact that they killed somebody." Brown contends that Cantu's statement, which amounts to an opinion that Brown was guilty, constitutes reversible error because it invaded the province of the jury. Because Brown's attorney did not object to this answer at trial, we apply a plain error standard of review:

The "plain-error" doctrine will be applied only where the error seriously affects the fairness or integrity of judicial proceedings. There must be a transgression of a clear and unequivocal rule of law, in a

clear and obvious way, which adversely affects a substantial right.

*Whiteplume v. State,* 841 P.2d 1332, 1343 (Wyo.1992) (citations omitted).

 We have often stated the rule that a State's witness, lay or expert, may not articulate an opinion as to the guilt of the accused. *Whiteplume; Bennett v. State,* 794 P.2d 879 (Wyo.1990); *Stephens v. State,* 774 P.2d 60 (Wyo.1989). "[T]o permit jurors to rely on a witness's opinion of the defendant's guilt 'would be the ultimate abdication of the function of the jury.'" *Whiteplume,* 841 P.2d at 1338 (quoting *Stephens,* 774 P.2d at 64); *Bennett,* 794 P.2d at 881. Although we have discussed the issue of lay opinion as to the guilt of the accused in numerous opinions, the offending testimony has generally come from a police officer involved in the investigation of the alleged crime, *see, e.g, Miller v. State,* 904 P.2d 344 (Wyo.1995); *McCone v. State,* 866 P.2d 740 (Wyo.1993); *Wells v. State,* 846 P.2d 589 (Wyo.1992); *Bennett; Stephens,* and has either been elicited by the prosecutor by a direct question, *e.g., Bennett, Stephens,* or invited by the defense on cross-examination, *e.g., McCone, Whiteplume.* The situation here is factually different enough from our previous cases that we believe Cantu's statement did not violate the rule against opinion testimony "in a clear and obvious way."

 Cantu's testimony, read in its entirety and in the context of the whole case, was focused on establishing a time line of the events that transpired on the night of the murder, as well as eliciting statements that Brown and Vena made about "taking care of business." Cantu was not examined as to her personal knowledge of the murder. The prosecutor did not ask Cantu if she had formed an opinion about Brown (or Vena) and to state that opinion. Rather, at the end of the direct examination, the prosecutor only sought to inquire into any bias that Cantu may have had against the two. Brown does not argue, nor does our review of the transcript reveal, that the prosecutor attempted to take advantage of Cantu's one-line response during closing argument or otherwise.

 Even assuming Cantu's testimony constituted error, Brown has failed to establish that the error affected a substantial right, in other words, that there exists a reasonable possibility that in the absence of the error the verdict might have been more favorable to him. *Zabel v. State,* 765 P.2d 357, 362 (Wyo.1988). The prosecution's case against Brown included testimony from numerous witnesses which placed Brown and Vena together on the night of the murder, physical evidence which tended to show that more than one individual was involved and linked the shotgun and special shells to Brown, and the incriminating statements of Brown's co-conspirator, Vena. Under the facts of this case, we find no plain error to warrant reversal.

### CONCLUSION

We conclude that no reversible error occurred in Brown's trial, and the order of judgment and sentence entered by the district court is affirmed.